UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**STEVEN B. SIVAK**, and **INTERNATIONAL
SAMARITAN**, on behalf of themselves and
all others similarly situated,

          Plaintiffs,

                                      No. 13-cv-15263
    vs.                               Hon. Gerald E. Rosen

**UNITED PARCEL SERVICE
COMPANY**,

          Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT IN ITS ENTIRETY OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS

### I. INTRODUCTION

Plaintiffs Steven B. Sivak and International Samaritan contend that United Parcel Service (UPS) intentionally overcharges customers who purchase additional liability coverage for packages with a declared value of over $300.00. Each overcharge may be less than $1.00, but these overcharges can quickly add up given UPS's position as the world's largest package delivery company. Under Plaintiffs' theory, UPS lines its pockets with these overcharges and pays off those who complain -- knowing that most will not do so for such a small overcharge per package. Plaintiffs' Amended Complaint therefore seeks class-wide relief for a

variety of causes of action under state and federal law.  Presently before the Court is UPS's Motion to Dismiss, or in the alternative, for Judgment on the Pleadings. Having reviewed and considered UPS's Motion and supporting brief, Plaintiffs' response thereto, and the entire record of this matter, the Court has determined that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process.  Therefore, the Court will decide this matter "on the briefs."  See Eastern District of Michigan Local Rule 7.1(f)(2).

## II. PERTINENT BACKGROUND AND FACTS

### A.    Federal Law Governing Carrier Liability

This action relates to -- but does not arise out of -- the Carmack Amendment, 49 U.S.C. § 13101 et seq., which renders common carriers like UPS liable for "actual loss or injury to . . . property" during interstate transport.  49 U.S.C. § 14706(a).  Its purpose is "to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods."  *Reider v. Thompson*, 339 U.S. 113, 119 (1950). The Carmack Amendment has the effect of "codif[ing] the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the

2

inherent vice or nature of the goods." *Mo. Pacific R.R. v. Elmore & Stahl,* 377 U.S. 134, 137 (1964) (citations omitted).  As pertinent here, it also allows carriers to limit their liability in exchange for charging a shipper a lower transportation rate:

> [A] carrier providing transportation or service . . .  may . . . establish rates for the transportation of property . . . under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.

§ 14706(c)(1)(A).

**B.    The Parties**

Plaintiff Steven B. Sivak is a resident of Ann Arbor, Michigan.  (Plfs' Am. Compl., Dkt. # 13, at ¶ 10).  Plaintiff International Samaritan is an Ohio nonprofit corporation with its principal place of business in Ann Arbor, Michigan.  (*Id.* at ¶ 11).  Defendant UPS is a Delaware corporation and is headquartered in Atlanta, Georgia.  (*Id.* at ¶ 21).  UPS is the "world's largest package delivery company. . . . In 2012, [for example, it] delivered an average of 16.3 million pieces per day worldwide, or a total of 4.1 billion packages."  (*Id.* at ¶ 34) (citing UPS's 2012 10-K filing with the Securities and Exchange Commission).

At issue in this litigation is UPS's practice of offering the "Value-Added Service" of increasing UPS's default $100.00 liability limit on packages in exchange for an additional fee.  Both Sivak and International Samaritan have used

3

UPS to ship items in the past six years. (*Id.* at ¶ 13). For some of these shipments, they each declared that the value of their respective shipments was in excess of $300.00 and therefore purchased additional liability coverage. (*Id.* at ¶¶ 12-13). Sivak shipped, for example, home stereo equipment and firearms on multiple occasions within the past six years, each with a declared value in excess of $300.00. (*Id.* at ¶ 14). The same is true for International Samaritan: it shipped two separate packages in October 2012 with a declared value in excess of $2,000.00. (*Id.* at ¶ 15; Ex. A to Plfs' Resp., Dkt. # 25).

## C.    The UPS Shipping Contract

Three documents govern Plaintiffs' shipment of packages through UPS: (1) the UPS Tariff/Terms and Conditions of Service (Terms); (2) the UPS Rate and Service Guide (Service Guide); and (3) Plaintiffs' Source Document from the shipment (collectively, the Shipping Contract). (Ex. A to Plfs' Am. Compl., Dkt. # 13, § 53). Within the Shipping Contract, three separate provisions are pertinent to Plaintiffs' claims: (1) UPS's $100.00 Liability Limit as set forth in the Terms and further detailed in the Service Guide and in the Source Document; (2) the Terms' 180-Day Notice Requirement; and (3) the Terms' discussion of Third-Party Retailers.

4

### 1.   UPS's $100.00 Liability Limit

Under Section 50 of the Terms and pursuant to the Carmack Amendment, UPS limits its liability for loss or damage to $100.00:

> *UPS's liability for loss or damage to each UPS domestic package or international shipment, or to each pallet in a UPS Worldwide Express Freight™ shipment, is limited to a value of $100*, except as set forth below.  Unless a greater value is recorded in the declared value field of the UPS Source Document or the UPS Automated Shipping System used, the shipper agrees that the released value of each domestic package or international shipment, or pallet is no greater than $100, which is a reasonable value under the circumstances surrounding the transportation, and that UPS shall not be liable for more than $100 for each domestic package or international shipment or pallet.

> *To increase UPS's limit of liability for loss or damage above $100, the shipper must declare a value in excess of $100 for each package or pallet in the declared value field of the UPS Source Document or the UPS Automated Shipping System used and pay an additional charge.*

(*Id.* at § 50) (emphasis added).  The Service Guide then sets forth the pricing for this "Declared Value of Carriage" for both domestic and international shipments.  For domestic shipments, it provides as follows:

| Declared Value for Carriage | Package | Package | |
|---|---|---|---|
| | – UPS's liability for loss or damage to a shipment is limited to $100 without a declaration of value. | – $0.00-$100.00 | $0.00 |
| | – The maximum declared value is $50,000.00 per package. UPS's liability for loss or damage can be increased up to $50,000.00 (subject to terms and conditions) by making a declaration of value for an additional charge. | – $100.01-$50,000.00 for each $100.00 (or portion of $100.00) of the total value declared | $0.85 |
| | | – Minimum | $2.55 |
| | – Declared Value charges for freight collect and third-party shipments may be billed to your shipper account. | | |
| | – Refer to ups.com/terms for more information. | | |

(Ex. B to Plfs' Am. Compl., Dkt. # 22, at 74).  There is a similar rate structure for international shipments:

| Declared Value for Carriage | – UPS's liability for loss or damage to a shipment is limited to $100.00 without a declaration of value.<br>– The maximum declared value is $50,000.00 per package/$100,000.00 per pallet. UPS's liability for loss or damage can be increased up to $50,000.00 per package or $100,000.00 per pallet by making a declaration of value for an additional charge (subject to terms and conditions).<br><br>– For shipments with a declared value of more than $50,000.00, multiply the total declared value by the rate to determine the declared value charge for the shipment.<br><br>– Declared Value charges for freight collect and third-party shipments may be billed to your shipper account.<br>– Refer to ups.com/terms for more information. | – $0.00-$100.00 $0.00<br>– $100.01-$50,000.00 for each $100.00 (or portion of $100.00) of the total value declared $0.85<br>– Minimum $2.55<br>– For shipments with a declared value of more than $50,000.00: $0.0085 times the declared value |

(*Id.* at 140).

In Response, International Samaritan attached a Source Document from its
October 23, 2012 shipment of goods with a declared value of $2,000.00.  (Ex. A to
Plfs' Resp., Dkt. # 25).[1]  The Source Document is International Samaritan's
shipping receipt from the UPS Store (a Third-Party Retailer discussed in more
detail below) and sets forth the Declared Value Terms & Conditions:

> Declared value coverage will be available only if You have complied
> with all Declared Value Terms & Conditions.  For an additional fee,
> We will obtain declared value coverage for Your shipment through
> the carrier designated on this PSO.  We surcharge the cost of this
> product.  You expressly acknowledge that the value of each parcel
> does not exceed the amount You listed below as Declared Value and
> stated on the transaction receipt.  If no amount is specified, You agree
> that the value of the parcel(s) shall not exceed $100.  If you refuse
> additional declared value coverage for items of greater value than
> $100, You will be limited to a maximum declared value coverage of
> $100.  Each declared value provider designates monetary limits
> coverage.  The declared value terms and conditions of the various

---

[1] Plaintiffs argue, and UPS does not dispute, that this Court may consider this
document -- one that was attached to Plaintiffs' Response -- without converting
UPS's Motion to one for summary judgment because it is a transactional document
relating to facts expressly alleged in Plaintiffs' First Amended Complaint and is
central to their claims.  This Court agrees.  *See, e.g., Weiner v. Klais and Co., Inc.,*
108 F.3d 86, 88 (6th Cir. 1997).

carriers are listed in the carrier service guide for coverage provided by the carriers and are also available at this location upon request. Consult the Declared Value Terms & Conditions and terms of coverage for further information.

(*Id.* at ¶ 10).  It further sets forth limitations on liability:

Our liability, the carrier's liability for loss or damage to Your parcel is limited to Your actual damages or $100, whichever is less, unless you declare and pay for a higher authorized value. . . . Limitations of liability can be found in the carrier's service guide or tariff.

(*Id.* at ¶ 11).

## 2.    UPS's 180-Day Notice Requirement

Under the Terms, a "shipper" is "the party contracting with UPS for services."  (Ex. A to Plfs' Am. Compl., Dkt. # 13, at 2).  Section 47.1 of the Terms spell out a shipper's obligation to bring certain billing disputes to UPS's attention within 180 days or else it is deemed waived:

Shippers requesting an invoice adjustment (e.g., adjustment of Charges based on an incorrect rate, billable weight, account number, failure to tender a shipment, type of service, shipping charge correction, etc.) or a refund due to a duplicate payment must notify UPS of the request within 180 days of receiving the contested invoice, or any billing dispute is waived.  Notification to UPS of a request for an invoice adjustment must be made in writing using one of the following methods:

–Submit a request through UPS's online Billing Center at ups.com/billing;
–Email a request to UPS through ups.com®; or
–Mail a request to United Parcel Service, P.O. Box 7247-0244, Philadelphia, PA 19170-0001;

7

> The notification to UPS must include the date of shipment, the tracking number for each disputed charge, and the reason for the disputed charge. A partial payment against an invoice is not considered a request for an invoice adjustment or notice to UPS of a disputed charge. UPS reserves the right to refuse to issue any invoice adjustment until all outstanding charges owing to UPS have been paid in full.

(*Id.* at § 47.1). In addition, the Source Document attached by International Samaritan discusses the steps one must take to file a claim: "Any and all claims must be in writing and received by Us within the carrier's required time frame. Claims not made within the prescribed time frame are waived and will not be paid." (Ex. A to Plfs' Resp., Dkt. # 25, at ¶ 12).

### 3. Third-Party Retailers

Finally, the Terms recognize that UPS utilizes a variety of franchises to facilitate shipment of packages (such as the one International Samaritan used). The Terms define these "Third-Party Retailers" as "locations of The UPS Store®, UPS Authorized Shipping Outlet locations, and UPS Alliance Locations (located within Office Depot® and Staples® retail locations)." (Ex. A to Plfs' Am. Compl., Dkt. # 13, at § 2). And as pertinent here, the Terms describe the relationship between UPS and these "Third-Party Retailers:"

> The UPS Store® locations . . . [and o]ther Third-Party Retailers are independently owned and operated businesses and are not agents of UPS. UPS assumes no liability other than to the Third-Party Retailer as the shipper of the package, for lost, damaged or delayed packages sent via the Third-Party Retailer. Any such liability to the Third-Party Retailer is subject to the limitations set forth in the Terms. All

8

> inquiries regarding packages shipped via any Third-Party Retailer
> must be directed to the Third Party Retailer that shipped the package.
> UPS will deal solely with the Third-Party Retailer in all matters
> concerning packages shipped via any Third-Party Retailer including,
> but not limited to: . . . billing.  Even if UPS responds directly to
> customers of the Third-Party Retailer regarding tracking requests,
> UPS will not be liable to those customers.  The Third-Party Retailer is
> solely responsible for the issuance of any refunds and claims to those
> who shipped packages via the Third-Party Retailer. . . . The Third-
> Party Retailer shall indemnify and hold harmless UPS in any action
> against UPS arising from the loss, damage, or delay of a package
> shipped via the Third-Party Retailer.

(*Id.* at § 15).

## D.    Plaintiffs' Claims

Based on the "Declared Value for Carriage" language above, Plaintiffs

contend that "UPS plainly states in its Terms that the first $100 of coverage is free

or at no additional charge, whether or not a shipper purchases additional declared

value coverage."  (Plfs' Am. Compl., Dkt. # 13, at ¶ 2).  But the problem,

according to Plaintiffs, is that when a shipper declares a value in excess of $100.00

and is therefore charged $0.85 per each portion of $100.00, UPS does not actually

provide the first $100.00 of coverage for free:

> Despite the promise by UPS that the first $100 of declared value
> coverage is free or at no additional charge, UPS has systematically
> charged and caused its agent and sales network to charge customers
> an additional amount for coverage for the first $100 when they
> purchase additional declared value coverage.

(*Id.* at ¶ 3).  This "problem" actually kicks in when a shipper declares a value in

excess of $300.00.  (*Id.* at ¶¶ 30-31).  This is because the Service Guide provides

9

for a $2.55 minimum for additional coverage, which divided by $0.85 equates to 3 portions of $100.00.  In other words, when a customer declares a value between $100.01 and $300.00, UPS charges the customer $2.55 for additional declared value coverage without apportioning $0.85 per $100.00 in coverage.

But when a customer declares a value above $300.00, Plaintiffs claim that UPS overcharges that customer by $0.85 by failing to account for the first $100.00 in free coverage that they assert the Shipping Contract promises.  (*Id.* at ¶ 32).  A simple chart perhaps better illustrates Plaintiffs' argument as to how UPS charges its customers versus how UPS *should* charge its customers:

| Declared Value | UPS Charges | UPS Should Charge |
|---|---|---|
| $0.00 - $100.00 | $0.00 | $0.00 |
| $100.01 - $300.00 | $2.55 | Plaintiffs make no claim that UPS overcharges customers in this category. |
| $300.01 - $400.00 | $3.40 (4 portions of $100.00 -- $0.85 times 4 equals $3.40). | $2.55 (3 portions of $100.00 over the initial first $100.00 in free coverage -- $0.85 times 3 equals $2.55). |
| $400.01 - $500.00 | $4.25 (5 portions of $100.00 -- $0.85 times 5 equals $4.25). | $3.40 (4 portions of $100.00 over the initial first $100.00 in free coverage -- $0.85 times 4 equals $3.40). |

10

And, these overcharges add up dramatically when one considers how many parcels UPS ships annually (referenced above), as well as its business structure: there are more than 4,700 independently-owned UPS Store locations and an additional 13,000 authorized shipping outlets (such as in Staples office supply stores) across the globe. (*Id.* at ¶ 9).

These overcharges, assert Plaintiffs, "reflect a deliberate breach of contract with and intentional effort to defraud its customers." (*Id.* at ¶ 8). For evidence of this deliberative misconduct, Plaintiffs note that a cottage industry has developed over the last 18 months of shipping consultants who audit large companies' shipping costs for savings and overcharges. (*Id.* at ¶¶ 4, 39). These shipping consultants have raised this practice of charging for the first $100.00 with UPS, which despite "acknowledg[ing] that the charge was not proper," has not "fix[ed] the problem." (*Id.* at ¶¶ 5, 42). UPS's standard practice is to just credit accounts for those customers who complain -- namely large volume shippers -- knowing that the bulk of its customers lack the means or sophistication to hire consultants to audit their shipping expenses. (*Id.* at ¶¶ 6, 8, 33, 40, 42).

Plaintiffs' purported class action seeks to halt this practice of defrauding its customers in the name of a "critical loss theory" scheme. (*Id.* ¶ 43). That is, deliberately overcharging all of its customers and then issuing refunds to those who complain, while knowing that most will not. Given the amount of packages

UPS ships in a given year, this scheme is quite lucrative: "[A]ssuming UPS earns $200 million in overcharges, and it refunds $10 million to those [large volume shippers who complain], UPS knows that it will get way with a net profit from the scheme of $190 million without risk of being held accountable." (*Id.*).

Several factual intricacies and processes help facilitate this scheme. "[T]he additional declared value charges are not itemized" for its customers; in order to properly evaluate the declared value charge, allege Plaintiffs, "a customer would have to 'back out' the math" which is "impracticable and normally practically or actually impossible to do while standing in line at a UPS shipping counter or UPS drop box or store." (*Id.* at ¶ 38). For example, International Samaritan's Source Document does not contain a separate line detailing how much the UPS Store charged when it declared a value of $2,000.00. (Ex. A to Plfs' Resp., Dkt. # 25, at 4). Plaintiffs also note that UPS has contractually limited its exposure to liability by requiring shippers to raise billing disputes "within 180 days of receiving the contested invoice." (Ex. A to Plfs' Am. Compl., Dkt. # 13, § 47.1).[2] Accordingly,

---

[2] Both Plaintiffs allege that they substantially complied with the Terms' 180-day requirement. Sivak tried to file a claim through UPS's website, but could not do so because he does not have a tracking number and does not have a UPS account. (Plfs' Am. Compl., Dkt. # 13, at ¶ 16). And even if he did have a tracking number, UPS's website would not permit him to submit a formal claim without registering and agreeing to a separate agreement, which he chose not to do. (*Id.*). International Samaritan also tried to file a claim through UPS's website, but was rejected from doing so because the tracking numbers it submitted were outside the 180-day limit. (*Id.* at ¶ 18).

when one combines the "concealment" of the overcharges, the 180-Day limit to contest such charges, and the simple fact that the typical overcharge is less than $1.00 per package, it is just "not rationally worth the effort" for most consumers to contest this practice.  (Plfs' Am. Compl., Dkt. # 13, at ¶ 44).

Plaintiffs' Amended Complaint therefore sets forth six different causes of action: (1) Breach of Contract; (2) Declaratory Relief; (3) Violation of 49 U.S.C. § 13708, which regulates a motor carrier's billing and collection practices; (4) Unjust Enrichment; (5) Violation of RICO, 18 U.S.C. § 1962(c); and (6) Violation of RICO, 18 U.S.C. § 1962(d).  UPS has now moved to dismiss Plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or in the alternative, for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Def's Mtn., Dkt. # 14).[3]  As set forth below, the Court agrees with UPS's Motion and dismisses Plaintiffs' Amended Complaint.

## III. DISCUSSION

### A.    Standard of Review

Because UPS answered Plaintiffs' original Complaint before moving to dismiss (Dkt. # 4), UPS's Rule 12(b)(6) motion is arguably untimely.  *Scheid v.*

---

[3] Plaintiffs have also moved for leave to file a sur-reply (Dkt. # 30) addressing the Supreme Court's recent preemption decision in *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422 (2014) and responding to what they characterize as "new" arguments regarding the 180-Day notice requirement.  (Dkt. # 30).  Because the Court does not need to address these issues as set forth in footnote 4, the Court denies Plaintiffs' Motion.

*Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 n.1 (6th Cir. 1988).  Plaintiffs

subsequently amended their Complaint as a matter of course pursuant to Federal

Rule of Civil Procedure 15(a)(1)(B).  (Dkt. # 13).  UPS did not answer Plaintiffs'

Amended Complaint and instead filed the present Motion under Rule 12(b)(6), and

in the alternative under 12(c).  Whether Rule 12(b)(6) or 12(c) applies to UPS's

Motion is but an academic exercise: even if Defendants' Motion is more properly

construed as one for judgment on the pleadings, a 12(c) motion is "evaluated . . .

under the standards for dismissal under Rule 12(b)(6)."  *Scheid*, 859 F.2d at 436

n.1.

    In deciding such a motion, the Court must construe the complaint in the light

most favorable to Plaintiffs and accept all well-pled factual allegations as true.

*League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir.

2007).  To withstand a motion to dismiss, however, a complaint "requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The

factual allegations in the complaint, accepted as true, "must be enough to raise a

right to relief above the speculative level," and must "state a claim to relief that is

plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.*

14

*Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for defendant's conduct."  *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).

The Sixth Circuit has emphasized that the "combined effect of *Twombly* and *Iqbal* [is to] require [a] plaintiff to have a greater knowledge . . . of factual details in order to draft a 'plausible complaint.'"  *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (citation omitted).  Put another way, complaints must contain "plausible statements as to when, where, in what or by whom," *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 373 (6th Cir. 2011), in order to avoid merely pleading an "unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.

**B.    Plaintiffs' State Law Claims**[4]

> **1.    Plaintiffs' Contractual Claims -- Counts I and II -- Fail as a Matter of Law**

The crux of Plaintiffs' case rests upon the notion that UPS's Shipping Contract provides customers with the first $100.00 of liability coverage for free and that despite this "contractual obligation," UPS charges its customers for this

---

[4] Given this Court's conclusion regarding the insufficiency of Plaintiffs' state law claims, it declines to decide whether Plaintiffs were obligated to contest the overcharges within 180 days under both the Shipping Contract and 49 U.S.C. § 13710(a)(3)(B), as well as whether the Federal Aviation Administration Authorization Act preempts Plaintiffs' unjust enrichment claim.

"free" coverage when it ships items with a declared value in excess of $300.00. Counts I and Counts II -- Breach of Contract and Declaratory Relief -- expressly arise out of the terms of the Shipping Contract and rise and fall together. As set forth below, Plaintiffs' construction of the Shipping Contract renders its plain and unambiguous language meaningless.

It is well-settled under Michigan law that courts must construe contracts according to their unambiguous terms. *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 53 (2003). The initial determination whether contract language is ambiguous is a question of law; if there is no ambiguity, the meaning of the contract likewise is a question of law for the Court to decide. *Port Huron Educ. Ass'n v. Port Huron Area School Dist.,* 452 Mich. 309, 323 (1996). "If the plain language is clear, there can be only one reasonable interpretation of its meaning and, therefore, only one meaning the parties could reasonabl[y] expect to apply." *Wilkie*, 469 Mich. at 61 (citation omitted). Only "[w]here the contract language is unclear or susceptible to multiple meanings" does its interpretation become a question for the trier of fact. *Port Huron*, 452 Mich. at 323. A court, however, must take care to avoid "creat[ing] ambiguity where none exists." *Smith v. Physicians Health Plan, Inc.,* 444 Mich. 743, 759 (1994). Rather, a contract is ambiguous only if "its words may reasonably be understood in different ways." *Raska v. Farm Bureau Mut. Ins. Co.,* 412 Mich. 355, 362 (1982). In resolving this matter, a court must construe a

16

contract "according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." *Dillon v. DeNooyer Chevrolet Geo,* 217 Mich. App. 163, 166 (1996). And as with statutory construction, the Court should "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 468 (2003). "Courts may [also] rely on dictionary definitions to find the meaning of terms used in a contract." *Morley v. Auto. Club of Michigan*, 458 Mich. 459, 470 (1998) (citation omitted).

Upon review of the Declared Value for Carriage language and the Shipping Contract as a whole, the Court concludes that the Shipping Contract unambiguously precludes Plaintiffs' constrained contractual interpretation. The Shipping Contract makes clear that "UPS's liability for loss or damage to a shipment is limited to $100.00 without a declaration of value." For packages with a declared value of "$0.00 - $100.00," it provides a charge of $0.00. In cases where a customer wants to increase UPS's liability, he or she must do so "by making a declaration of value for an additional charge." As set forth in the table directly across from this statement, an $0.85 charge applies "for each $100.00 . . . of the *total value declared*." Though the term "total value declared" is not defined in the Shipping Contract, its core modifier -- "total" -- plainly means relating to the "whole," "not divided" and "of or relating to something in its entirety." BLACK'S

17

LAW DICTIONARY (9th ed. 2009); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (2014).  The Shipping Contract's use of the phrase "total" therefore unambiguously means that packages shipped with a declared value of between $100.01 and $50,000.00 are charged $0.85 for each $100.00 (or portion of $100.00 thereof) *of the total value declared.*

Plaintiffs argue that the word "'total' clearly qualifies a specified range ($100.01 - $50,000.00) such that for all of the increments . . . there is a charge of $0.85 for the total value declared."  (Plfs' Resp., Dkt. # 19, at 16).  By placing the "total value declared" language after the specified range, Plaintiffs argue, the Shipping Contract "indicates that [the 'total' qualifier] means the total declared value in that range."  (*Id.*)  In so stretching this language, Plaintiffs' Response shows the nature of their constrained reading as they must *add language* -- "in that range" -- in order to phrase the contract in a way that fits their theory.  Essentially, Plaintiffs ask that this Court add the following language to give life to their contractual theories: "$100.01 - $50,000 for each $100.00 . . . of the total value declared *above $100.00*."  This Court will not rewrite an unambiguous contract.

Indeed, the placement of the phrase "total value declared" supports a finding of unambiguity.  That phrase is immediately preceded *not by* a "specified range" as Plaintiffs insist, but rather by the dollar value that provides the applicable apportionment of the $0.85 cents: "*for each $100.00* (or portion of $100.00) of the

total value declared."  The only possible reading is that when one declares a value of $100.01 - $50,000.00, UPS charges $0.85 "*for each $100.00* (or portion of $100.00) of the total value declared."  Accordingly, the "total value declared" language clarifies that the additional charge applies to the *entire* value and not just the entire value *above $100.00*.

Plaintiffs' interpretation also cannot be reconciled with the $2.55 minimum charge, a charge that must be read in conjunction with the rest of the table. Plaintiffs essentially maintain that the Shipping Contract charges $0.85 for each $100.00 or portion thereof and that the "first" $100.00 is free.  In sum, this would operate as follows:

| Declared Value | Additional Charge |
|---|---|
| $0.00 - $100.00 | $0.00 |
| $100.01 - $ 200.00 | $0.85 |
| $200.01 - $ 300.00 | $1.70 |
| $300.01 - $ 400.00 | $2.55 |

But Plaintiffs do not assert that UPS "overcharges" its customers for shipments with declared values between $100.01 and $300.00.  Nor could they.  The presence of the $2.55 minimum charge confirms that UPS *does not* provide the first $100.00 in free coverage for declared values over $100.00.  To accept Plaintiffs' premise, this Court would also need to read out the minimum charge.  This Court will not so modify unambiguous language.

The same is true with respect to declared values of more than $50,000 for

international shipments.   As set forth above, the language in that provision instructs shippers that "for shipments with a declared value of more than $50,000, multiply the total declared value by the rate to determine the declared value charge for the shipment."   Or, "$0.0085 times the declared value."   If the Shipping Contract provides the first $100.00 for free as alleged by Plaintiffs, this unambiguous language certainly does not reflect such a promise.

Finally, the Court notes that other provisions within the "Value-Added Services" section of the Service Guide references some "free" services that UPS provides to certain shippers:

| | | |
|---|---|---|
| UPS My Choice Member | – Proactive alerts via text, phone or e-mail the day before a delivery, the morning of delivery, and/or Confirmation of Delivery. | Free |
| | – Recipients may give authorization online for UPS to deliver packages without a signature. | |
| | – Hold for Will Call at a UPS Customer Center. | |
| | – UPS will provide delivery information, typically a four-hour approximate delivery time. | |
| | Service upgrades: | |
| | – Reroute or reschedule delivery: | $5.00 per package |
| | • Deliver to a UPS Retail Location*: Have packages delivered to a location of The UPS Store®. | |
| | • Reschedule Delivery: Have packages delivered on a different day. | |
| | • Deliver to Another Address: Reroute* delivery to another address. | |
| | • Set a vacation and have all packages delivered to a location of The UPS Store or delivered on one of the three business days after the vacation ends. | |
| | – Upgrade UPS SurePost** to UPS Ground. | $3.50 per package |
| UPS My Choice Premium Member | – Includes same features as a UPS My Choice Member, with unlimited rerouting and rescheduling. Annual fee does not include service upgrades. | $40.00 annual fee |
| | – Provides an online Delivery Planner to help manage and track recipients' home deliveries. | |
| | – Ability to designate where the driver should leave packages (e.g., porch). | |
| | – Leave a package with a neighbor (someone within sight of the original delivery address). | |
| | Service upgrades: | |
| | – Reroute and reschedule delivery options. | – Free, Unlimited |
| | – Confirmed Delivery Window: Select a two-hour confirmed delivery window. | – $5.00 per package |
| | – Upgrade UPS SurePost** to UPS Ground. | – $3.50 per package |

(Ex. B to Plfs' Am. Compl., Dkt. # 19, at 128).   The Service Guide also references offering other services for "no additional charge."   (*Id.* at 62, 87, 190, 199).   UPS's

use of these terms -- especially the use of the word "free" *within* the same "Value-Added Services" section -- completely undermines any argument that the Shipping Contract does not permit billing for the first $100.00 of declared value coverage without charge for packages with a declared value of over $300.00.

The Court therefore finds that the Shipping Contract is unambiguous and may not be rewritten to fit Plaintiffs' interpretation. Plaintiffs' claims for breach of contract and declaratory relief must be dismissed.

### 2.   Plaintiffs' Unjust Enrichment Claim -- Count IV -- Fails as a Matter of Law

Plaintiffs plead their Unjust Enrichment claim in the alternative to their contract claim. (Plfs' Am. Compl., Dkt. # 13, at ¶¶ 75-81). There is no question that the Federal Rules of Civil Procedure permit parties to plead alternative theories, even theories that are inconsistent. *Detroit Tigers, Inc. v. Ignite Sports Media, LLC*, 203 F. Supp. 2d 789, 793 (E.D. Mich. 2002) (Borman, J.) (citing Fed. R. Civ. P. 8(d)(2)-(3)). "In other words, a pleading does not become insufficient by reason of a party having made alternative, or even contradictory, claims." *Id.* (citing *Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88, 92 (6th Cir. 1982)).

With that said, the Federal Rules' mere permission to plead in the alternative does not automatically necessitate a finding that an unjust enrichment claim may proceed in the face of pleading that a contract exists. It is well-settled that "[u]njust enrichment . . . is not applicable when the parties are bound by an express

21

written agreement." *APJ Associates, Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 617 (6th Cir. 2003). Under Michigan law,

> The elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant. In such instances, the law operates to imply a contract in order to prevent unjust enrichment. *However, a contract will be implied only if there is no express contract covering the same subject matter.*

*Barber v. SMH (US), Inc.*, 202 Mich. App. 366, 375 (1993) (internal citations omitted and emphasis added).

Here, Plaintiffs' Amended Complaint only relies upon the existence of the Shipping Contract to form the basis of their claim that UPS systematically overcharges those who declare values in excess of $300.00. It unequivocally asserts that "Plaintiffs and the members of the [purported] Class are parties to uniform contracts with UPS regarding the shipment of items." (Plfs' Am. Compl., Dkt. # 13, at ¶ 56). Their Amended Complaint also makes clear that UPS's Terms "contain[] 'the general terms and conditions of contract under which . . . [UPS] is engaged in the transportation of shipments.'" (*Id.* at ¶ 26) (citing the Terms). And "[p]ursuant to the terms of [the Shipping Contract], UPS is contractually obligated to provide[] Plaintiffs and the members of the [purported] Class with $100 of coverage for loss of damage at no additional charge for each shipment." (*Id.* at ¶ 57).

22

Plaintiffs have failed to adequately plead unjust enrichment. They have identified no conduct by UPS representing that it would provide the first $100.00 of liability coverage free of charge other than the express language addressed above within the Shipping Contract. It is clear under Michigan law that Plaintiffs and UPS have a contractual relationship by virtue of Plaintiffs shipping packages pursuant to the Shipping Contract, and that this contractual relationship precludes Plaintiffs from bringing their unjust enrichment claim. Simply, Michigan law does not permit this Court to imply a contract where there is an express contract covering the same subject matter. *Barber*, 202 Mich. at 375; *Ealey v. Benjigates Estates, LLC*, 2013 WL 6409987, at *5 (E.D. Mich. Dec. 9, 2013) (Berg, J.) (similar); *Savett v. Whirlpool Corp.*, 2012 WL 3780451, at *7 (N.D. Ohio Aug. 31, 2012) ("[C]ommon sense dictates that an ordinary consumer transaction . . . is governed by a contract. Because the dispute centers around whether defendant delivered what it promised, the existence of an express contract bars an unjust enrichment claim."). Plaintiffs have just not put forth any argument distinguishing this well-settled principle from those deviating cases where there was a question as to whether the contract at issue applied. (Plfs' Resp., Dkt. # 19, at 18-19).[5]

---

[5] Plaintiffs' briefing also argues that Defendant's "lack of contractual privity" affirmative defense (presumably in reference to its use of third-party retailers) raises issues regarding the scope of the Shipping Contract that are not appropriate at this procedural posture. (Plfs' Resp., Dkt. # 19, at 19). "For purposes of a motion for judgment on the pleadings, *all well-pleaded material allegations of the*

Accordingly, Plaintiffs' Unjust Enrichment claim fails.

**C.     Plaintiffs' Federal Claims**

**1.      Plaintiffs' 49 U.S.C. § 13708 Claim -- Count III -- Fails as a Matter of Law**

49 U.S.C. § 13708 sets forth UPS's various billing and collection obligations

as a motor carrier.  In relevant part, it provides as follows:

> (a) Disclosure.   A motor carrier subject to jurisdiction under subchapter I of chapter 135 shall disclose, when a document is presented or electronically transmitted for payment to the person responsible directly to the motor carrier for payment or agent of such responsible person, the actual rates, charges, or allowances for any transportation service and shall also disclose, at such time, whether and to whom any allowance or reduction in charges is made.
>
> (b) False or misleading information.  No person may cause a motor carrier to present false or misleading information on a document about the actual rate, charge, or allowance to any party to the transaction.

§ 13708(a-b).  Plaintiffs allege that by charging customers for the first $100.00 for

packages with a declared value in excess of $300.00 notwithstanding its

representations in the Shipping Contract to the contrary, UPS violates both of these

subsections.  (Plfs' Am. Compl., Dkt. # 13, at ¶¶ 70-71).

---

*pleadings of the opposing party must be taken as true*, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (citation omitted and emphasis added).  As set forth in text, Plaintiffs expressly alleged that they were "parties to uniform contracts with UPS" and are bound by this admission.  *Hughes v. Vanderbilt Univ.,* 215 F.3d 543, 549 (6th Cir. 2000).  And, more importantly, Plaintiffs have not identified any conduct sufficient to support their "overcharge" theory that is divorced from the Shipping Contract.

Very few federal courts have addressed such claims. At the outset and though not raised by the parties, the Court notes that the Sixth Circuit has not examined whether 49 U.S.C. § 14704(a)(2) -- the Interstate Commerce Commission Termination Act's "Rights and remedies of persons injured by carriers or brokers" provision -- creates a private right of action for Plaintiffs' claims. *See also Mason and Dixon Lines, Inc. v. Steudle*, 761 F. Supp. 2d 611, 622 (E.D. Mich. 2011) (Lawson, J.) ("Courts have reached inconsistent results on whether 49 U.S.C. § 14704(a)(2) creates a private right of action."). The bulk of the case law suggests that because Section 14704(a)(2) makes a "carrier or broker . . . liable for damages sustained by a person as a result of *an act or omission of that carrier* or broker in violation of this part" and because the legislative history and regulatory guidance suggest private enforcement, Section 14704(a)(2) creates a private right of action. *See, e.g., Fulfillment Servs. Inc. v. United Parcel Serv., Inc.*, 528 F.3d 614, 620-21 (9th Cir. 2008) (rejecting UPS's argument that § 14704(a)(2) did not authorize a right of action to bring a claim under another provision of the Interstate Commerce Commission Termination Act, § 13703, noting that "[a]lthough Congress may have had different purposes in enacting different provisions of the [Motor Carrier Act], the plain language of § 14704(a)(2) provides equally a damages remedy for 'an act or omission . . . in violation' of the [Act], without discriminating as to provisions under the Act."); *see also Owner-*

*Operator Indep. Drivers Assoc., Inc. v. New Prime, Inc.*, 192 F.3d 778, 783-85 (8th Cir. 1999) (similar); *Fitzpatrick v. Morgan Southern, Inc.*, 261 F. Supp. 2d 978, 979-81 (W.D. Tenn. 2003) (similar); *Tayssoun Transp., Inc. v. Universal Am-Can, Ltd.*, 2005 WL 1185811, at *12-16 (S.D. Tex. Apr. 20, 2005) (collecting cases). This Court need not reach a conclusion on this issue because even assuming that Section 14704(a)(2) authorizes Plaintiffs to sue UPS for violations of Section 13708, Plaintiffs have not stated a claim for relief under Section 13708 for two reasons.

First, Plaintiffs premise their Section 13708 claim solely on their view of the Shipping Contract.  Having comprehensively addressed this constrained view above, Plaintiffs' Section 13708 theory collapses and therefore fails to state a claim for relief.  They have not set forth any facts indicating that UPS failed to disclose "the actual rates, charges, or allowances" and "whether and to whom any allowance or reduction in charges [was] made."  Nor have they set forth any facts indicating that a person caused UPS to "present false or misleading information on a document about the actual rate, charge, or allowance to any party to the transaction."  *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678; *see also U1IT4less, Inc. v. FedEx Corp.*, 896 F. Supp. 2d 275, 293-94 (S.D.N.Y. 2012) (discussed in more detail *infra*); *Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*, 2012 WL 4049955, at *9 (S.D.N.Y. Sept. 14, 2012) (holding that

26

subsection (b) did not apply to a common carrier "because it did not 'cause a motor carrier to engage in the relevant conduct; rather, [the common carrier] *itself* engaged in this conduct"); *Haley Hill Designs, LLC v. United Parcel Services., Inc.*, 2009 WL 4456209, at *3 (C.D. Cal. Nov. 23, 2009) (dismissing plaintiffs' claims under Section 13708(a) and (b) because they did not allege "that the rate was falsely inflated or otherwise inaccurate," could not "point to any 'false or misleading information' given by [UPS]," did not allege that UPS's "invoices failed to disclose the actual rates and charges," and "that Section 13708(b) does not even apply to motor carriers, but rather to 'person[s]' who 'cause a motor carrier to present false or misleading information,' *i.e.,* a customer who receives an off-bill discount that it does not want the carrier to disclose to the ultimate payer.") (second alteration in original)).[6]

Second, even if this Court concluded otherwise, it is persuaded that Section 13708 does not support a claim that a common carrier *overbilled* for shipping services. Though very few district courts have addressed the scope of Section 13708, the *U1IT4less* matter out of the Southern District of New York presents

---

[6] Plaintiffs apparently recognize their pleading problem with respect to subsection (b), arguing in Response that discovery may reveal that UPS "caused its affiliated motor carriers to present false and misleading rate information in the alleged billing scheme" or that "UPS gives third-party retailers a portion of the alleged overcharge." (Plfs' Resp., Dkt. # 19, at 36-38 & n.24). There are two problems with this argument. First, Plaintiffs have not alleged such facts in their Amended Complaint. Second and even if they did, their "overcharge" allegation falls apart when one reviews the plain language of the Shipping Contract.

27

analogous facts and claims and contains significant on-point discussion that is well-reasoned. Accordingly, this Court finds it to be persuasive and therefore alternatively finds that Plaintiffs' Section 13708 claim is not supported in law.

In *U1IT4less*, the plaintiff shipped hundreds of packages weekly via FedEx. 896 F. Supp. 2d at 281. The plaintiff did so by licensing FedEx's shipping software so that it "could transmit details of each of its shipments to [FexEx], print shipping labels, and schedule pick-ups with FedEx." *Id.* As pertinent here, the plaintiff alleged that FedEx charged plaintiff "for a shipment weight that was greater than the actual package weight." *Id.* This "upweighting" occurred because FedEx's software "cause[d] package weight . . . to be fixed at a fictive higher weight than its actual weight." *Id.* at 282. FedEx knew this, alleged plaintiff, but concealed it by utilizing "a labyrinthine and corrupt" billing model that "obscure[d] billing discrepancies, and . . . include[d] draconian billing adjustment terms and conditions, and other unfair and deceptive structures, terms and tools designed to disadvantage customers in their transactions with [FexEx]." *Id.* "For example, [FedEx's] billing system disaggregates charges for a single shipment into many different statements, 'with no single invoice itemizing and totaling all the charges included in each transaction,' making it difficult for shippers to piece together the total charge for a single shipment." *Id.*

In addition to "upweighting," the plaintiff also alleged FedEx overcharged for custom fees on shipments to Canada and failed to apply certain discounts. *Id.* at 283-84. As to the former, the shipper was to pay Canadian customs charges under FedEx's standard shipping agreement unless the shipper informed FedEx that the recipient would pay. *Id.* at 283. The plaintiff so informed FedEx, but FedEx charged customs fees anyway. *Id.* As to the latter, the plaintiff alleged that FedEx's pricing agreement entitled it to certain discounts that FedEx did not apply. *Id.* at 284.

On these facts, the plaintiff alleged that FexEx violated Section 13708(b)'s prohibition against presenting "false or misleading information on a document about the actual rate, charge, or allowance to any party to the transaction." The *U1IT4less* court dismissed this claim, finding that "Section 13708 requires disclosure of (and prohibits false or misleading information associated with) off-bill discounts and the like. . . . [Accordingly, it] proscribe[s] presentation of a document (such as an invoice) indicating that a customer was charged a certain amount, when in fact the carrier *actually* charged that customer a lesser amount." *Id.* at 294. In so holding, the court discussed the section's legislative history and agency guidance:

> Section 7 of the Negotiated Rates Act of 1993 amended the predecessor of Section 13708 to state:

29

(a) REGULATIONS LIMITING REDUCED RATES.—
Not later than 120 days after the date of the enactment of
this section, the Commission shall issue regulations that
prohibit a motor carrier subject to the jurisdiction of the
Commission under subchapter II of chapter 105 of this
title from providing a reduction in a rate set forth in its
tariff or contract for the provision of transportation of
property to any person other than (1) the person paying
the motor carrier directly for the transportation service
according to the bill of lading, receipt, or contract, or (2)
an agent of the person paying for the transportation.

(b) DISCLOSURE OF ACTUAL RATES, CHARGES,
AND    ALLOWANCES.—The    regulations    of    the
Commission issued pursuant to this section shall require
a motor carrier to disclose, when a document is presented
or transmitted electronically for payment to the person
responsible directly to the motor carrier for payment or
agent of such responsible person, the actual rates,
charges, or allowances for the transportation service and
shall prohibit any person from causing a motor carrier to
present false or misleading information on a document
about the actual rate, charge, or allowance to any party to
the transaction. Where the actual rate, charge, or
allowance is dependent upon the performance of a
service by a party to the transportation arrangement, such
as tendering a volume of freight over a stated period of
time, the motor carrier shall indicate in any document
presented for payment to the person responsible directly
to the motor carrier for the payment that a reduction,
allowance, or other adjustment may apply.

Negotiated Rates Act of 1993, Pub. L. No. 103–180, § 7, 107 Stat.
2044, *repealed by* ICC Termination Act of 1995, § 102(a), Pub. L.
No. 104–88, 109 Stat. 803, 804.  Section 7(a) mandated regulations
prohibiting "off-bill discounting" -- that is "a practice by which motor
carriers provide discounts, credits or allowances to parties other than
the freight bill payer, without notice to the payer."  *See Regulations
Implementing Section 7 of the Negotiated Rates Act of 1993,* Ex Parte
No. MC–180 (Sub–No. 3), 2 S.T.B. 73, 1997 WL 106986, at *1 (Feb.

25, 1997). Section 7(b) -- the nearly-verbatim predecessor to Section 13708 -- mandated "truth-in-billing" regulations, *i.e.,* regulations requiring disclosure of the "actual rate, charge or allowances for the transportation service[s]." *See id.* at *1 & n. 6. The ICC Termination Act of 1995 (which created the STB) repealed the Section 7(a) mandate to issue off-bill discount regulations, and placed the Section 7(b) truth-in-billing requirements directly into Section 13708. *See §§* 102(a), 103, 109 Stat. at 804, 873; *Regulations Implementing Section 7 of the Negotiated Rates Act of 1993,* 1997 WL 106986, at *2 ("Now, the statute no longer requires that we maintain regulations prohibiting the practice of granting off-bill discounts; it does, however, affirmatively require carriers to disclose certain information when they engage in the practice."); *id.* at *4 ("Off-bill discounting is not prohibited by statute, while truth-in-billing provisions are expressly embodied in the statute.").

*Id.* at 293-94.

Against this statutory and regulatory backdrop, the *U1IT4less* court drew a distinction between what the statute proscribed and what the plaintiff alleged:

[T]he statute is not directed at activity alleged in connection with the upweighting and Canadian Customs schemes. The statute prohibits invoices hiding off-bill discounts; Plaintiff does not allege that Defendants did that. While the upweighting or Canadian Customs schemes might be said to involve invoices that *overcharged* Plaintiff, it cannot be said that these invoices misrepresented that a higher rate was charged when actually a lower rate was charged.

With respect to the "missing discounts," Plaintiff alleges it was entitled to receive certain discounts, and that "defendants failed to apply or improperly applied the discounts to which plaintiff was entitled." This is not the hiding of off-bill discounts to which Section 13708(b) is directed; Defendants are not alleged to have actually granted a discount that did not appear on a bill. Instead, Plaintiff alleges it was entitled to discounts it did not receive. Section 13708(b) simply does not apply to this activity.

31

> In other words, Section 13708(b) prohibits issuing a bill for amount *x*
> when the actual charge is less than *x*.  Here, Defendants are alleged to
> have actually charged *x* when by contract Plaintiff should have been
> charged less than *x*.  Defendants' conduct did not misrepresent the
> "actual rate [or] charge" within the meaning of Section 13708(b), and
> thus the Motion to Dismiss Count IV is granted.

*Id.* at 294 (internal record citations omitted).

This Court finds the *U1IT4less* decision to be well-reasoned and persuasive.
Both matters present the indistinguishable allegation that a common carrier
*overbilled* for shipping services.  Section 13708(a) and (b) address "truth-in-
billing," mandating that bills reflect the actual charges assessed -- including an
explanation of discounts that are applied off the four corners of an invoice.  It
simply does not apply to Plaintiffs' allegations that UPS's bills reflect charges that
were more than agreed to.[7]

### 2.    Plaintiffs' RICO Claims -- Counts V and VII -- Fail as a Matter of Law

In coordination with its affiliated franchises and sales network, Plaintiffs

---

[7] Plaintiffs' reliance on *Grocery Haulers* does not change this Court's conclusion
that Section 13708 does not apply to "other types of misleading billing practices."
(Plfs' Resp., Dkt. # 19, at 37).  In that matter, a carrier transported goods directly
to customers instead of to a consignee as agreed with the shipper.  *Grocery
Haulers*, 2012 WL 4049955, at *2-4.  The carrier invoiced the shipper as if it had
delivered the goods to the consignee (and saved the consignee the cost of shipping
the goods to the end-customer).  *Id.*  The court, without significant discussion,
found that the carrier violated subsection (a) by presenting invoices that contained
inaccurate miles driven and inappropriate road use taxes.  *Id.* at *8.  But as set forth
in text, Plaintiffs have not identified any false or misleading billing practices by
UPS outside of their alleged "overbilling" claim.

allege that UPS "engaged in a scheme to defraud Plaintiffs" by fraudulently overcharging customers for declared value coverage. (Plfs' Am. Compl., Dkt. # 13, at ¶¶ 82-99). By "using the wires and mail to bill and cause charges to be billed to Plaintiffs . . . that include the Declared Value Overcharge," Plaintiffs assert that UPS is liable under RICO for participating in an enterprise of racketeering activity in violation of 18 U.S.C. § 1962(c) and for conspiring to do so in violation of 18 U.S.C. § 1962(d). (*Id.* at ¶ 87). More "specifically," Plaintiffs assert that "UPS and the Declared Value Enterprise members knew the bills for the first $100 of Declared Value coverage was fraudulent and unauthorized. UPS has been repeatedly informed of the impropriety of this charge, as has its partners, and they nonetheless have failed to take corrective action and instead have knowingly or at least recklessly failed to alter its behavior." (*Id.* at ¶ 90). UPS argues that this Court should dismiss these claims for a host of reasons, including because Plaintiffs have not identified a "misrepresentation" sufficient to infer a scheme to defraud. This Court agrees.

18 U.S.C. § 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

It is well-established that in order to prevail on a RICO cause of action, a plaintiff

must establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Moon v. Harrison Piping Supply,* 465 F.3d 719, 723 (6th Cir. 2006) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985)). "Racketeering activity" is any act that is indictable under certain enumerated federal criminal statutes.  18 U.S.C. § 1961(1)(B); *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322 (6th Cir.1999).  In this case, Plaintiffs have identified UPS's alleged "racketeering activity" as mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of § 1343.  (Plfs' Am. Compl., Dkt. # 13, at ¶ 89).

The Sixth Circuit recently described the pleading requirements for setting forth predicate acts of mail and wire fraud sufficient to state a RICO claim as follows:

> Mail fraud consists of "(1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme." *United States v. Jamieson,* 427 F.3d 394, 402 (6th Cir. 2005).  The elements of wire fraud are essentially the same except that one must use the wires in furtherance of the scheme to defraud.  *United States v. Daniel,* 329 F.3d 480, 486 n.1 (6th Cir. 2003) (noting that the statutes share the same relevant language and the same analysis should be used for each).  "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Jamieson,* 427 F.3d at 402.  A plaintiff must also demonstrate *scienter* to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information.  *United States v. DeSantis,* 134 F.3d 760, 764 (6th Cir. 1998).

34

> When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.,* 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.,* 10 F. Supp. 2d 879, 883 (N.D. Ohio 1998)). A RICO plaintiff is not required to plead or prove first-party reliance on an allegedly false statement. *See Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 648, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008). To allege a valid RICO claim, however, a plaintiff must show not only that the predicate act was a "but for" cause of plaintiff's injuries, but also that it was a proximate cause. *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). A plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

*Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404-05 (6th Cir. 2012). Plaintiffs' RICO claims do not satisfy this standard.

Courts, including the Sixth Circuit, are skeptical of finding RICO claims that "sound[] in contract. [One] cannot successfully transmute them into RICO claims by simply appending the terms 'false' and 'fraudulent.'" *Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 363 (3d Cir. 2010). In *Blount v. Financial Services, Inc. v. Walter E. Heller & Company*, for example, the Sixth Circuit dismissed a RICO claim "arising from a financing contract" where the plaintiff alleged that the defendant "charged a rate of interest which was illegal under the contract between the parties:"

> *The fact that the parties take different positions under the contract as to the appropriate prime rate, or the fact that the defendant charged too high a "prime rate" and thereby concealed or refused to disclose*

> *what the plaintiff considers the true prime rate called for under the*
> *contract, does not give rise to a valid claim for fraud*. . . . The plaintiff
> has not alleged with particularity any such false statement of fact and
> therefore the District Court was correct in dismissing the complaint.
> Sending a financial statement which misconstrues the prime rate
> provided by the terms of the contract may breach the contract but it
> does not amount to a RICO mail fraud cause of action. Rule 9(b)
> requiring "averments of fraud . . . with particularity" is designed to
> allow the District Court to distinguish valid from invalid claims in just
> such cases as this one and to terminate needless litigation early in the
> proceedings.

819 F.2d 151, 152-53 (6th Cir. 1987) (emphasis added).

Other courts within this District and across the United States are in accord with *Blount*'s general holding that RICO claims arising out of contracts must sufficiently plead fraudulent acts independent of a breach of contract. In *Kevelighan v. Trott & Trott, P.C.*, for example, Judge Duggan of this District dismissed an allegation that various entities fraudulently enforced mortgage agreements through "Pooling and Servicing Agreements" "by sending billing notices that attempted to collect excessive attorney fees and/or repayment of advances not yet due." 771 F. Supp. 2d 763, 778 (E.D. Mich. 2010) (Duggan, J.). In so dismissing the plaintiffs' RICO claims, Judge Duggan noted that the claims "primarily sound[ed] in contract. The parties simply dispute, under the relevant mortgage terms, the amount of attorney fees that can be charged and when repayment of advancements become due. Plaintiffs cannot transform these claims into RICO claims by merely alleging that the purported attempts to breach the

36

mortgage terms were done 'fraudulently.'"  *Id.* (citing *Blount* and *Kolar*). Similarly, Judge Steeh recently dismissed RICO claims where the plaintiff "claim[ed] that [the] defendants billed plaintiff for tax related services at a rate that was not agreed to by the parties.  However, sending billing invoices which erroneously apply a charge for tax related services under the terms of a contract does not amount to fraud." *C & L Ward Bros., Co. v. Outsource Solutions, Inc.*, 2012 WL 3157005, at *5 (E.D. Mich. Aug. 3, 2012) (Steeh, J.); *see also Renaissance Ctr. Venture v. Lozovoj*, 884 F. Supp. 1132, 1144 (E.D. Mich. 1995) (Hackett, J.) (similar); *Kolar*, 361 F. App'x at 363 (collecting cases).

To be sure, the Sixth Circuit has subsequently clarified that "*Blount* does not stand for a blanket prohibition of RICO claims related to contract disputes." *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 885 (6th Cir. 1990).  In that case, Dana Corporation entered into an agreement with Blue Cross, whereby Blue Cross would administer its benefits plan.  *Id.* at 884.  Under the terms of the contract, Dana was to pay Blue Cross a refund if it exceeded certain cost limitations.  *Id.*  Blue Cross was supposed to adjust its charges to Dana to reflect these refunds, but allegedly never did.  *Id.*  Dana also alleged that "Blue Cross represented at meetings that Dana was receiving the benefit of Blue Cross's cost reductions resulting from any hospital rebates." *Id.*

The district court dismissed Dana's RICO claims for failing to state a claim

37

and denied leave to amend, even though Dana alleged, as pertinent here, "specific

instances of intentional false representations made by Blue Cross to Dana" and

"that Blue Cross similarly defrauded a number of other [similar] clients."  *Id.* at

884-85.  In reversing, the Sixth Circuit contrasted the lack of allegations of specific

misrepresentations in *Blount* with those in *Dana*:

> We hold that Dana made sufficient allegations of intentional fraud by
> Blue Cross to withstand a Fed.R.Civ.P. 12(b)(6) motion to dismiss,
> for the focus is upon the pleadings, not any proof or evidence.  *Blount*
> does not stand for a blanket prohibition of RICO claims related to
> contract disputes.  Rather, the reason for dismissal in *Blount* was that
> the plaintiff failed to make sufficient allegations of
> "misrepresentations or omissions which were 'reasonably calculated
> to deceive persons of ordinary prudence and comprehension.'"  819
> F.2d at 153 (citation omitted).  *In contrast, Dana has made such
> allegations of misrepresentations and omissions by Blue Cross. . . .
> We also note that Dana's allegations are partially based upon
> "information and belief."  However, in the proposed second amended
> complaint, Dana made specific allegations of fraud, including the
> letters alleged to contain misrepresentations.*  Issues as to Dana's
> proof of its allegations can be decided at a later stage; Dana's present
> allegations of intent are sufficient to state a claim.

*Id.* at 885-86 (emphasis added).

Here, Plaintiffs' Amended Complaint makes clear that the "fraudulent

activity" about which they complain is derived solely from their flawed

interpretation of the Shipping Contract.  As discussed above, they do not allege any

"fraudulent conduct" outside of Plaintiffs' own attempt to twist the Shipping

Contract's language into something that it does not say.  They have not, for

example, pointed to any other writing by UPS or a statement by one of its

employees that could be construed as being part of a scheme to misrepresent the manner in which UPS charges for declared values in excess of $300.00.[8]  Just like their other claims, Plaintiffs' § 1962(c) claim collapses upon exposure of their contractual misreading.  And because that claim fails, so does their conspiracy claim.  *Craigshead v. EF Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1989).[9]

## IV. CONCLUSION

For these reasons,

IT IS HEREBY ORDERED that Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint in its Entirety or, in the alternative, for Judgment on the Pleadings [Dkt. # 14] is GRANTED;

---

[8] At best, Plaintiffs have alleged "on information and belief" that unidentified "shipping consultants" have brought "UPS's practice of charging for the first $100 . . . to UPS's attention" and that "UPS routinely acknowledges the overcharge and credits the account."  (Plfs' Am. Compl., Dkt. # 13, at ¶¶ 5, 8, 33, 42). Such an allegation falls well short of Rule 9(b)'s heightened pleading standards.  Plaintiffs have not identified a specific shipping consultant, a shipper who received a credit, or set forth specific facts as to how UPS acknowledged that the charge was improper.

[9] It is this Court's general practice to provide a plaintiff with an opportunity to amend a Complaint when faced with a dismissal that is readily curable because slight defects should not condemn an otherwise viable complaint.  This practice need not be followed here, however, because amendment would be futile.  *See, e.g., Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420-21 (6th Cir. 2000).  In response to Defendant's Motion, Plaintiffs did not hint at additional factual allegations they could add to save their claims from dismissal.  *Lewis v. Wheatley*, 528 F. App'x 466, 470 (6th Cir. 2013) (amendment is futile when, among other things, a plaintiff does not "provide[] any additional factual allegations that [it] would submit in an amended complaint").

IT IS FURTHER ORDERED that Plaintiffs' First Amended Complaint is dismissed with prejudice; and

IT IS FURTHER ORDERED that Plaintiffs' Motion for Leave to File Sur-Reply in Opposition to Motion to Dismiss [Dkt. # 30] is DENIED.

**IT IS SO ORDERED.**


Dated:  July 1, 2014                    s/Gerald E. Rosen
                                        Chief, Judge, United States District Court


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 1, 2014, by electronic and/or ordinary mail.

                                        s/Julie Owens
                                        Case Manager, (313) 234-5135